No. 32,538

The State of Kansas, ex rel. Clarence V. Beck, Attorney General, etc., *Plaintiff*, v. The Board of County Commissioners of the County of Riley, *Defendant*.

(47 P. 2d 449)

Opinion filed July 6, 1935.

*Clarence V. Beck*, attorney general, *Earl B. Swarner* and *Theo. F. Varner*, assistant attorneys general, for the plaintiff.

*Hal E. Harlan, A. M. Johnston*, both of Manhattan, and *Scott Pfuetze*, county attorney, for the defendant.

The opinion of the court was delivered by

Smith, J.: This is an original action in quo warranto whereby the state questions the right of the county commissioners of Riley county to issue certain warrants and bonds.

The facts are admitted.

The question is, Does Riley county come under the terms of chapters 90 and 140 of the Laws of 1935?

Chapter 90 applies to counties having a population of not less than 19,000 and not more than 21,000 and having an assessed valuation of not less than $27,000,000 nor more than $30,000,000. It provides that such counties may issue emergency warrants in the amount of $36,306 in excess of the amount of general revenue fund warrants which the county might issue for the year under the laws existing prior to the taking effect of the act.

Chapter 140 applies to counties having a population of less than 21,000 and more than 20,000 and an assessed valuation of less than $30,000,000 and more than $27,000,000. It confers on the board of county commissioners the power to issue bonds for the purpose of acquiring land and improving it for the purpose of establishing a park and recreational grounds under certain circumstances.

The board of county commissioners of Riley county attempted to take advantage of chapter 90 on April 9, 1935, and of chapter 140 on May 6, 1935. This action challenges their power to do so. All are agreed that Riley county comes within the provisions of both chapters as far as population is concerned. The state contends that the actual valuation of the county is more than $30,000,000. If this be correct, then the county does not come within the statutes and the commissioners do not have the power they are attempting to exercise.

The facts as to the assessed valuation of the county are as follows:

In June, 1934, after the assessment of property was made in Riley county and the board of county commissioners had acted as a board of equalization, the county clerk, pursuant to R. S. 79-1604, forwarded an abstract of the assessment rolls of the county to the state tax commission, which acts as the state board of equalization. The amount of the assessed valuation of the county, as shown by this abstract, was $29,937,785. In July, 1934, the state tax commission, sitting as a state board of equalization, equalized the valuation and reported it to the county clerk according to the terms of R. S. 79-1410. The valuation thus reported was $29,953,553. This was an increase by the state board of equalization of $15,768. This valuation was certified to the county in August, 1934. Between August 1, 1934, and November 1, 1934, the county clerk found other property which had escaped assessment. This property was added

to the assessment rolls pursuant to R. S. 79-1432 and R. S. 79-1427. The amount of this property was $157,029. This made the assessed valuation for the county $30,110,582. The taxes for 1934 were assessed upon the valuation of $30,110,582.

It will be noted that chapters 90 and 140 of the Laws of 1935 in providing to what counties the act shall apply use the term "assessed valuation." The state contends that this means the valuation that is finally certified to the county treasurer, while the defendants contend that it means the equalized valuation that is certified to the county commissioners by the state tax commission.

In the resolution by which the county commissioners sought to take advantage of chapter 90 it is stated that at the time they were making the budget for 1935 the commissioners erroneously assumed that they would receive $36,306 for use in meeting the current expenses, which sum was due from or had been refunded by the city of Manhattan or the board of education of the city of Manhattan and other taxing districts of the county. The resolution recited that the board relied on this money and failed to make a sufficient levy to meet the budget requirements and that this money never was received.

The resolution by which the commissioners attempted to take advantage of chapter 140 contains all the necessary statements. The only question in this case is, Does Riley county come under the two chapters on account of its assessed valuation?

There must of necessity be some official record of the assessed valuation in a county which may be taken as the criterion for cases of this kind. It should not be the valuation placed on the property and certified to the state board of equalization by the county board, because the statute contemplates that this valuation is subject to the action of the state board, which may either raise or lower it as its judgment requires. After the valuation is certified to the county commissioners by the state board the statute does not contemplate any further changes except such as were made here under the provisions of R. S. 79-1432 and 79-1427 or certain statutes which will be noted. These changes are purely incidental. The amount of them could not be contemplated. The purpose of these statutes is to enable the proper officers to see that no property properly taxable in the county shall escape taxation. They are not a part of the final machinery set up for the purpose of determining how much taxes shall be levied.

R. S. 79-1409 is part of this machinery. It provides in part as follows:

". . . Whenever the valuation of any taxing district, whether it be a county, township, city, school district or otherwise, is changed by the state board of equalization, the officers of such taxing district who have authority to levy taxes are required to use the valuation so fixed by the state board as a basis for making their levies for all purposes. . . ."

This provision is mandatory. (See *Railway Co. v. Harper County*, 88 Kan. 651, 129 Pac. 1165.)

The valuation is certified to the county board of equalization sometime during August. In the meantime the county commissioners have met and prepared their budget for the coming year in compliance with R. S. 1933 Supp. 79-2927. Sometime during August the other taxing districts of the county file their budgets with the county clerk, together with their tax levies. When the valuation is received from the state tax commission the county commissioners apply the budget requirements of the county to it and thus determine what the levy must be in the county. The certificate from the state tax commission contains a statement as to what the levy for state purposes shall be. Thus is made up the final tax levy. The county clerk retains this equalized assessment from the state tax commission on file in his office. He uses the levy rate that has been arrived at by the county commissioners and applies it to each piece of taxable real property in the state and all the taxable personal property. This is the tax roll which he certifies to the county treasurer. It is that roll which that official uses in the collection of taxes.

At any time after the assessment rolls are turned over to the county clerk until they are certified to the county treasurer on November 1, it is the clerk's duty to put any property on the tax roll which for some reason has not been put there. To enable him to inquire into such situations he has power to summon witnesses and conduct hearings. (See R. S. 79-1432.)

By another statute the county clerk is given authority to place property on the tax rolls where it has escaped assessment, and where it has escaped assessments within five years preceding he shall place it on the rolls for those years at twice its value. (See R. S. 79-1427.)

These are not all the sections that provide for a possible change in the assessed valuation in a county. R. S. 79-1701 provides that any time previous to November 1 the county clerk may correct

errors in the tax rolls. By the provisions of the same sections the county clerk cannot make any more corrections after November 1, but from that time until February 1 of the next year the county commissioners may make corrections. At any time up to June 20 of the succeeding year the tax commission may correct errors. This section provides that valuation placed on property shall not be considered under the act, but a change could be considered that would make a difference in the assessed valuation of the county.

R. S. 79-1702 provides that at any time prior to August 1 of the year succeeding the one when the assessment was made the state tax commission may remedy any grievance that is called to its attention. This section is made to apply to any grievance which has not been remedied under the preceding sections.

It will be seen from an examination of these sections there is no time when the assessed valuation of a county, as it appears on the rolls, is not subject to change from March 1 of the year when the property is assessed until August 1 of the succeeding year. There is, however, a time when the valuation is fixed for the purpose of making the levy. That is when the valuation is certified down to the county by the state board of equalization. The changes that may be made pursuant to the sections that have been reviewed are incidental changes. They are intended to prevent unjust taxation and to make sure that all property pays its share of taxes. On the other hand, the valuation as certified by the state board of equalization is always on file and remains the same throughout the entire year. When it is certified to the county clerk for the current year it takes the place of the one that had been on file for the preceding year. During the entire year, however, this valuation would remain the same. It is logical to presume that when the legislature used the term "assessed valuation" in the acts under consideration the intention was that the valuation upon which the budget of the county is based was to be used rather than some other valuation that might fluctuate from day to day. It is not too much to say that when the valuation is returned to the county clerk the assessment of property in the county is complete. What remains to be done does not relate to fixing a valuation for property, but to correcting errors and finding property which for one reason or another had not been placed on the tax rolls at all.

The legislature had this intention when it enacted R. S. 10-301. That section provides a limitation on the amount of bonds which

may be issued by any municipality. It must be only a certain per-
cent of the assessed valuation as shown by the last finding and
determination by the proper board of equalization. This means the
last finding of the state board of equalization is certified to the
county clerk. The above statute is not controlling in this case, but
it does throw some light on the necessity—in cases that depend on
a valuation being fixed—of a holding that the valuation should be
certain for the year.

In the absence of a direction by the legislature otherwise we con-
clude that the words "assessed valuation" used in chapters 90 and
140 of the Laws of 1935, mean the assessed valuation as found by
the last action of the state board of equalization and certified to the
county clerk.

One more question remains in this case. The valuation certified
to the state board of equalization for 1934 on the tangible property
was $28,420,914. The total valuation of intangible property was
$1,516,781. The state board of equalization certified back a valu-
ation of $28,419,708 for tangible property, and $1,533,845 for in-
tangible property. The combined valuation of tangible and in-
tangible property, as found by the state board, was $29,953,553.
As has been stated heretofore, the county clerk added enough prop-
erty after the valuation was returned to make the valuation, as
filed with the county treasurer, $30,110,582. It will be seen that if
intangible property is not considered as a part of the assessed
valuation the county will be within the terms of chapters 90 and
140 of the Laws of 1935 even though a different conclusion had
been reached on the point considered in the first part of this opinion.

We shall consider that question. The two valuations are certified
as separate items by the county. They are considered separately
and certified back to the county clerk. The rate of taxes to be
borne by this class of property is fixed by the statute at five mills
on the dollar valuation. The money thus raised is apportioned by
an arbitrary method under R. S. 1933 Supp. 79-3115. This appor-
tionment provides that one sixth shall be paid to the state general
fund, one sixth to the county general fund, one third to the general
fund of the city or township and one third to the general fund of
the school district in which such intangible property is assessed.
It will be seen that the levy made by the different taxing bodies is
not applied to the intangible property. The certificate sent down

by the state board states what the rate of levy for the state purposes shall be on the tangible property. The intangible property is not assessed with the intention that it pay the ad valorem rate.

The tangible property is the only property upon which is extended a tax levy for raising money to pay bonds, the interest on bonds and warrants such as are being considered in this case.

If the assessed valuation of intangible property is included, together with all tangible property, in arriving at the assessed valuation of a county for the purpose of fixing its authorized bonded and other indebtedness then clearly the tangible property would carry and pay an unfair and added tax burden placed upon it by reason of any indebtedness, such as bonds or warrants, no part of which intangible property ever pays.

Plaintiff urges that in the past when the assessed valuation of counties has been examined to ascertain whether proposed bond issues were within the limit set by statutes the valuation of intangible property has been used as the criterion plus that of the tangible property. Concern is felt that a holding by this court that the valuation of intangible property is not a part of the assessed valuation of the county will render some bond issues invalid. This court cannot pass on such a question until it is submitted to it. It is doubtful, however, whether such a holding would have any effect on the validity of any bonds that have been sold heretofore.

The conclusion of this court is that the words "assessed valuation" as used in chapters 90 and 140 of the Laws of 1935 mean the assessed valuation as found by the last action of the state board of equalization before the county board attempted to take advantage of these chapters, and that in finding what the assessed valuation of a county is the tangible property only should be considered, and not the intangible.

The writ of quo warranto will be denied.

JOHNSTON, C. J., not sitting.